IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 8, 2016

**STATE OF TENNESSEE v. SHAROD WINFORD MOORE**

**Appeal from the Circuit Court for Marshall County**
**No. 13CR6   F. Lee Russell, Judge**

**No. M2015-00663-CCA-R3-CD – Filed June 28, 2016**

The Defendant, Sharod Winford Moore, appeals as of right from his jury conviction for first degree premeditated murder. See Tenn. Code Ann. § 39-13-202. On appeal, the Defendant contends: (1) that the evidence is insufficient to support his conviction; (2) that the trial court erred in overruling his motion for change of venue; (3) that the trial court erred in denying his request to present evidence of the victim's propensity for violence; (4) that the trial court erred in denying his request to charge the jury with Tennessee Pattern Jury Instruction 42.09(a), designating Jason McCollum as an accomplice as a matter of law; (5) that the trial court erred in allowing an "incompetent" witness, Clifford Watkins, to testify; (6) that the trial court erred in denying a request to cross-examine Mr. Watkins regarding a previous arrest and subsequent determination by the Middle Tennessee Mental Health Institute that he was incompetent to stand trial; (7) that the trial court erred in denying his pre-trial motion to keep the State from eliciting testimony that the Defendant was a member of the Vice Lords gang; (8) that the prosecutor engaged in misconduct during closing argument "by misstating [the] law concerning the definition of reasonable doubt"; and (9) that the District Attorney General's Office committed a Brady violation by providing defense counsel with "redacted 'exculpatory' witness statements," foreclosing counsel's ability to determine whether those "witness[es] could provide exculpatory testimony." Following our review, we determine that the Defendant's failure to timely file a motion for new trial results in waiver of all issues except for sufficiency of the evidence. Furthermore, we conclude that the evidence was sufficient to support the Defendant's conviction. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and CAMILLE R. MCMULLEN, J., joined.

Melissa Lee Thomas, Fayetteville, Tennessee, for the appellant, Sharod Winford Moore.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Robert James Carter, District Attorney General; and Weakley E. (Eddie) Barnard and Michael David Randles, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

This case arises from the January 29, 2011 shooting death of the victim, Ronald Shelton. On January 23, 2013, a Marshall County grand jury indicted the Defendant for the first degree premeditated murder of the victim. The case proceeded to trial in October 2014, where the following evidence was produced.

Clifford Watkins lived with Nola Lindner in an apartment located across the parking lot from the building where the victim's apartment was located. Mr. Watkins was acquainted with the victim and had spoken with him earlier in the evening on January 29, 2011. The victim had asked Mr. Watkins and Ms. Lindner to go to the store for him, and the couple agreed, buying him three or four "tallboys." Mr. Watkins and Ms. Lindner delivered the beer to the victim between 4:30 and 5:30 p.m. Mr. Watkins spoke with the victim for the last time that day around 8:00 p.m. and then went back to his apartment to go to bed.

Around 10:00 p.m., Mr. Watkins was asleep on the couch in his living room when he heard what he thought were fireworks but which he later described as three gunshots. Mr. Watkins got up off the couch and looked out the kitchen window. From that vantage point, he could see the front of the victim's apartment, and he saw "a big guy and a little guy." He could not identify the "big guy," but the smaller individual looked like someone named "Jay" who lived in a house on the corner of 7th Avenue, in close proximity to the apartments. He said that the two men were "standing right there in front of" the door to the apartment located next to the victim's. Mr. Watkins saw the men running away from the apartments and in the direction of the house where Jay lived. Mr. Watkins returned to bed.

Ms. Lindner was in bed, although not asleep, when she heard three loud noises "[w]ithin a second or two after each other." Ms. Lindner thought the noises were from fireworks because "there [were] kids in the neighborhood who liked to shoot fireworks." Ms. Lindner did not get up to investigate, but she said that Mr. Watkins came into the bedroom and asked whether she heard anything. They spoke briefly about the noises, and Mr. Watkins left the room.

About thirty minutes later, Mr. Watkins came back into the bedroom and asked Ms. Lindner whether they should check on the victim. Ms. Lindner explained that both she and Mr. Watkins were concerned that the victim had been depressed lately, and they worried about him "when he was drinking." Mr. Watkins walked to the victim's apartment to check on him. Mr. Watkins said that the door to the victim's apartment was slightly cracked open, and he noticed that there was a bullet hole through the door's glass panel. Mr. Watkins knocked on the door but received no response. He then returned to his apartment and asked Ms. Lindner to call the police.

Randy McQueen was living with his family on 7th Avenue in January 2011. Around 10:20 p.m. on January 29, 2011, Mr. McQueen heard what he believed were three gunshots. He described the timing of the gunshots as not "quite as rapid as a machine gun" but agreed it was probably "as fast as somebody . . . could pull a trigger." Mr. McQueen walked out onto his front porch ten to fifteen seconds after hearing the gunshots but did not observe anything out of the ordinary.[1] He called the police to report the gunshots and went back inside his house. Mr. McQueen said that "it was quiet after that," and he "didn't see no [sic] cars, didn't see nobody [sic] running, didn't see nothing [sic] . . . until the police officer got there." He said that he saw police at the apartment building located across the street from his house approximately thirty minutes after making the call reporting gunshots.

At 10:22 p.m. on January 29, 2011, Lewisburg Police Department ("LPD") Officer Jennifer McDonald[2] was on patrol during a night shift, lasting from 6:00 p.m. to 6:00 a.m., when she received a call from dispatch to investigate a report of "loud pops" in the vicinity of 7th Avenue in Lewisburg, Tennessee. Officer McDonald drove around the area for ten to fifteen minutes, but she did not detect any suspicious activity. She communicated with Officer Amanda Binkley, who had also responded to the dispatch and who reported that she similarly detected nothing suspicious in the area. The officers "cleared the call on the radio," and Officer McDonald returned to her regular patrol.

Officer McDonald received a second call from dispatch at 10:58 p.m. reporting a possible vandalism at an apartment located on 7th Avenue South. She was the first officer to respond to the apartment. Officer McDonald said that the parking lot in front of the apartment building was "pretty dark" and that her car's headlights provided most of the light in the area. There were no other cars in the parking lot. When she stepped

---

[1] Mr. McQueen's home faced 7th Avenue, and from the vantage point of his front porch, the victim's apartment was located across the street and slightly to the right, although the apartment was not visible from his house.

[2] By the time of trial, Officer McDonald had married and changed her surname to Dunbar; however, she is referred to throughout the trial as Officer McDonald, and we will refer to her as such for clarity.

out of her vehicle, two individuals, Mr. Watkins and Ms. Lindner, approached her. Mr. Watkins and Ms. Lindner directed Officer McDonald toward the apartment that was the subject of the reported vandalism. Officer McDonald did not see anyone else in the area when she first arrived.

As she approached the apartment, Officer McDonald observed that there was a hole in the glass panel on the top half of the front door and, although still intact, the glass was shattered. She described it as "creaking just like shattered glass does." She said that the bottom of the door was wood, and there was "something . . . hung up" behind the glass panel on the door, "like a blanket," for privacy.

Officer Binkley arrived on the scene, and the officers knocked on the apartment's door, which was closed "all the way," and called out the victim's name.[3] There was no answer, and they called their supervisor, Corporal Jackie Robertson, to advise him that they were concerned for the victim's welfare and wished to enter the apartment. Corporal Robertson arrived and made the decision to enter the apartment. Corporal Robertson entered the apartment first, followed by Officer Binkley and Officer McDonald. They immediately observed the victim's body lying on the floor.

The victim was lying on his back at the foot of his bed, "clearly" dead. The victim's eyes were open; he was not breathing; and there was "a lot of blood on his face" and blood "running all down his chest." Additionally, there were visible wounds or "holes" in his chest area.

An investigation of the crime scene showed that there were blood droplets and glass on the floor in the doorway to the victim's apartment. There were also blood droplets on the bedroom floor[4] and a large blood stain on the mattress. The blood patterns were consistent with the victim's being shot at the door, stumbling into the bedroom, falling over the bed, and eventually resting in a supine position at the foot of the bed.

The victim had $30 and some change on his person, and nothing appeared to be missing from his apartment, leading investigators to conclude that robbery was not a motive for his murder.

---

[3] Due to her frequency patrolling the area, Officer McDonald knew that the victim lived in the apartment prior to arriving at the scene that night.

[4] The victim's apartment had been converted from a motel room and was very small. Thus, the "bedroom" was a combined bed and living room and that room was located immediately to the left of the apartment's front door.

Three spent shell casings were recovered from the parking lot outside the victim's apartment. Based on the location of the casings, it appeared that the shooter was standing slightly to the right of the door to the victim's apartment. A subsequent examination showed that the casings were Winchester brand 9mm Luger cartridge casings.

The Defendant had been developed as a person of interest by the early morning hours of January 30, 2011. Between 5:30 and 6:00 a.m., three detectives went to the apartment where the Defendant lived with his mother, Polly Crabtree, who had also been the victim's girlfriend. Although detectives did not search the apartment, the Defendant did not appear to be home at the time.[5]

On January 29, 2011, Brenda Kay Davis was living with her son, Jason McCollum, on the corner of West Commerce Street and 7th Avenue in a house that had been converted into apartments. Ms. Davis knew the victim, whom she described as a neighbor and "a very good friend." Ms. Davis was also acquainted with the Defendant, whom she had known "since he was little" because the Defendant and her son "grew up together." She said that everyone called the Defendant by his nickname, "C-Mo."

Ms. Davis said that on the night of January 29, she was playing cards and drinking with Heather McCollum,[6] who was Jason's fiancé at the time, and Jason in his bedroom. At some point, Jason left the apartment. Ms. Davis and Heather were still in Jason's bedroom when the two women heard what they thought were fireworks. However, upon further discussion, the two decided that the noises sounded more like gunshots.

Shortly after hearing the gunshots, Jason returned to the apartment, and the Defendant entered the apartment a few seconds later. Jason and the Defendant "stood around in the living room," and the Defendant then made a phone call. According to Ms. Davis, the Defendant was wearing a green, yellow, and black jacket. The two men went into the kitchen and took something out of the refrigerator. Ms. Davis saw the men "rubbing stuff on their hands and arms." She was unsure what they had taken out of the refrigerator and were rubbing on themselves, but she said that the substance was yellow. Ms. Davis said that she went to sleep and was unsure when the Defendant left.

Jason McCollum testified that in January 2011 he was living with his mother; he said that his young son and Heather frequently stayed there as well. Jason said that he was often called by his nickname, "Jay." According to Jason, he had known the victim

---

[5] There was no testimony as to any further investigation into the Defendant as a suspect, but he was not arrested until implicated by his accomplice.

[6] Because Heather and Jason McCollum share a surname, we will utilize their first names for clarity. We intend no disrespect in doing so.

for about five years, and the two were friendly and always got along. He said that he and the victim would sit on each other's porches, smoking cigarettes and drinking, but that they did not go into each other's homes and did not go places together.

Jason said that he knew who the Defendant was but that he "most certainly did not" spend time with him. According to Jason, the Defendant knew where he lived because he gave Jason a ride home on one occasion. Jason was walking home from the store with groceries, and the Defendant saw him and offered a ride, which Jason accepted.

On the evening of January 29, Jason said that he was at home with his son, mother, and Heather. He received a phone call from an unknown number, which he did not answer. However, his phone "kept going off," so he eventually answered it. The caller asked if he was speaking to "Jay," and Jason asked who was calling. The caller said, "C-Mo," and asked whether Jason was at home. Jason described the Defendant as "irate" and said that the Defendant told him he was "fixing to kill this mother F'er because he just put his hands on [the Defendant's] mom for the last damn time." Jason knew that the Defendant was referring to the victim because he "had heard about some things that had went on." The Defendant stated that he was coming to Jason's apartment and hung up the phone. Jason said that, at the time, he was unsure whether the Defendant was "blowing off steam or whether he was serious."

Ten or fifteen minutes later, the Defendant arrived at Jason's apartment. Jason said that he and the Defendant went to his son's bedroom and that Ms. Davis and Heather were in Jason's bedroom. According to Jason, he walked into the room first, followed by the Defendant, and he had his back to the Defendant when he noted that his son was staring at something behind him. Jason turned around and saw that the Defendant had a gun out. Jason instructed his son to leave the room. He said that the Defendant was wearing all black and was carrying a black plastic garbage bag, which looked like it had something in it. The Defendant said, "Bruh, you're going to take your ass over here and get this mother f---er to open this door."

Jason put his hands up and said, "Okay." The Defendant left the garbage bag on the floor in Jason's son's room, and Jason went to the front door and stepped outside; the Defendant followed. The two men walked towards the victim's apartment with Jason leading the way. Jason said the parking lot in front of the victim's apartment was very dark because the parking lot light was broken. Jason walked up to the victim's front door, and the Defendant stood to his left "in the shadows." Jason knocked on the door, and the victim answered. Jason asked the victim for a cigarette, and the victim turned back toward his apartment and reached inside to get one. The victim gave Jason the cigarette, and Jason thanked him before turning to walk away. Jason said he made it one to two steps before he heard three gunshots. He immediately took off running back to his

apartment. As he started to open his front door, he realized the Defendant was right behind him, and the Defendant "kind of pushed [him] into [his] door."

Once the two were back inside Jason's apartment and the door was closed, the Defendant put the gun to Jason's head and told him to "shut the f--k up and do everything [the Defendant] told [him] to do or he was going to kill everybody in [Jason's] house." According to Jason, he and the Defendant went back to his son's room, and the Defendant picked up the garbage bag that he had left in the bedroom earlier and asked whether Jason had any mustard. Jason took the Defendant to the kitchen and got a bottle of mustard out of the refrigerator. The Defendant "started putting the mustard on his hands and his arms, all the way up to . . . his elbow[s]." The Defendant told Jason that mustard was "supposed to take off gun residue or powder from when a gun is fired." The Defendant washed the mustard off, reapplied it a second time, and rinsed it off again. Jason denied that he put mustard on his arms.

The Defendant told Jason to stay in the kitchen, and the Defendant walked toward the bathroom. When he returned, he was wearing different clothes, which Jason described as a white shirt, red sweatpants, and a black and yellow coat. The Defendant handed Jason the garbage bag and instructed him to "get rid of" it. Jason stashed the bag in a "red, plastic Rubbermaid" that he kept under his kitchen table. Jason then went into his bedroom, where Heather, his mother, and his son were. The Defendant accompanied him and sat down on a futon, talking to Ms. Davis "like nothing was wrong at all."

According to Jason, the Defendant remained at his apartment until 6:00 a.m. on January 30. The Defendant told him that he had heard the police department usually changed shifts around that time. Before leaving, the Defendant wrapped up the gun in "a black bandana, handkerchief-type deal" and told Jason to "put [the gun] up, and that he was going to send somebody to get it." Jason put the gun under the dresser in his bedroom.

Jason said that he went to sleep, and when he woke up later that morning, he told Heather that he had something he needed to get rid of. Heather went to borrow a car, and when she returned, Jason collected the bag of clothes, and Heather drove him to a remote wooded area. Jason put the bag on the ground, covered it in lighter fluid, and set it on fire.

Later that same day, the Defendant and another individual came to Jason's apartment. The Defendant asked, "Did you do that? Did you take care of that?" Jason understood that the Defendant was asking whether he had hidden the gun and gotten rid of the clothes, and Jason answered affirmatively. Jason said that the Defendant had "an unsure look, like he didn't know whether [Jason] might have said something to somebody

or things of that nature." The Defendant told him that he would send someone to pick up the gun later.

The next day, Jason took the gun out of its hiding place and examined it. He described it as a black gun, with "9 mm" and either "Ruger" or "Luger" written on it. He replaced the gun underneath the dresser, and sometime thereafter, a person came to his apartment to retrieve the gun.[7]

Jason said that he eventually moved to another house in Lewisburg. One day, "out of the blue," the Defendant came to his house. Jason was unsure how the Defendant knew where he lived. According to Jason, the Defendant said, "I need to holler at you" and "I'm going to let you know." The Defendant then left, and Jason had no contact with him afterwards. On another occasion, "an individual showed up at [Jason's] house threatening him" because the individual had apparently heard that Jason was going to report the Defendant's involvement in the victim's death.

Jason said that he did not contact police initially because he was scared. In August 2012, Jason finally went to the LPD and told officers what happened. Jason said that at the time, he had no criminal charges pending against him. He also averred that no one from the District Attorney Generals's Office promised him anything in exchange for his testifying against the Defendant.

Jason admitted that at the time he gave his statement to investigators about the victim's murder, he also spoke with them about the murder of John Poteete. Heather[8] had been recently charged with the first degree murder of Mr. Poteete and arson for the subsequent burning of his house. Jason told police that he was not involved in Mr. Poteete's murder but that he had set Mr. Poteete's house on fire after he was already dead in an attempt to help Heather. He said that he had been charged with arson and accessory after the fact in the Poteete case and with first degree murder and conspiracy to commit first degree murder in the instant case.

Jason also admitted that he had, on previous occasions, told his mother and brother that he had killed the victim. With respect to these statements, Jason explained that his "choice of words at that moment weren't [sic] the best" but that what he meant to express was that he felt "horrible" because "he could not stop [the victim] from dying . . . ."

Victoria Cordova testified that on the night of January 29, 2011, she was walking down 7th Avenue from her mother's house on her way to visit her boyfriend. As she

---

[7] Jason was not specific about when this occurred or who collected the gun.

[8] By this time, Jason and Heather had married.

passed the apartments where the victim lived, she saw police cars. She knew that the victim lived there, and she stopped to talk to her friend, Wendy Hall, who was standing outside and who told her what happened to the victim. Ms. Cordova continued on her way and saw Jason, Heather, and the Defendant standing on the porch at Jason's apartment.

Ms. Cordova said that she went into Jason's apartment with Jason, Heather, and the Defendant. According to Ms. Cordova, the group went into Jason's bedroom. The Defendant and Heather sat down, and Ms. Cordova described the Defendant as being "quiet" and "a little bit [fidgety]." She said that Jason "was more anxious-like . . . pacing back and forth."

Ms. Cordova testified that, eventually, the Defendant and Jason left the bedroom. She was unsure where they went and did not see either of them again that night.

Jeremy Matthews testified that he was Jason's biological, but not legal, brother. Mr. Matthews explained that he had been adopted, but he and Jason nonetheless maintained a close relationship. Several months after the victim's murder, Jason told him that he "went to the door and shot [the victim] through the door at an angle." On another occasion, Jason said that "he felt responsible" for the victim's death because he was there when it happened. He also told Mr. Matthews that the Defendant was with him during the murder. However, according to Mr. Matthews, Jason also said that he "didn't actually kill the guy," but he "felt like he had the responsibility for it because he was there." Mr. Matthews described his brother as an alcoholic and said that Jason had been drinking on the two or three occasions that he talked with him about the victim's murder.

An autopsy revealed that the victim had three injuries to his left chest, characterized as two gunshot wounds and one ballistic wound.[9] The medical examiner said that one bullet struck the aorta and another traveled through the left lung and esophagus. Either of these wounds would have been fatal. The third bullet rested in the soft tissue under the victim's skin, did not enter the chest cavity, and would have, by itself, been non-life threatening. The medical examiner estimated that the victim's death would have been swift, within seconds to minutes after the fatal gunshots. The victim's death was classified as a homicide resulting from multiple gunshot wounds.

Upon this proof, the jury convicted the Defendant of first degree premeditated murder, and the trial court imposed a sentence of life imprisonment. This appeal followed.

---

[9] The medical examiner explained that one was characterized as a ballistic wound because no intact bullet was recovered, only a jacket.

ANALYSIS

On appeal, the Defendant asserts the following errors: (1) that the evidence is insufficient to support his conviction; (2) that the trial court erred in overruling his motion for change of venue; (3) that the trial court erred in denying his request to present evidence of the victim's propensity for violence; (4) that the trial court erred in denying his request to charge the jury with Tennessee Pattern Jury Instruction 42.09(a), designating Jason as an accomplice as a matter of law; (5) that the trial court erred in allowing an "incompetent" witness, Mr. Watkins, to testify; (6) that the trial court erred in denying a request to cross-examine Mr. Watkins regarding a previous arrest and subsequent determination by the Middle Tennessee Mental Health Institute that he was incompetent to stand trial; (7) that the trial court erred in denying his pre-trial motion to keep the State from eliciting testimony that the Defendant was a member of the Vice Lords gang; (8) that the prosecutor engaged in misconduct during closing argument "by misstating [the] law concerning the definition of reasonable doubt"; and (9) that the District Attorney General's Office committed a Brady violation by providing defense counsel with "redacted 'exculpatory' witness statements," foreclosing counsel's ability to determine whether those "witness[es] could provide exculpatory testimony." The State responds that the Defendant has waived all issues except for sufficiency of the evidence by failing to timely file a motion to new trial. Additionally, the State asserts that the Defendant has waived all issues, including sufficiency of the evidence, for failing to include citations to the record in the argument section of his brief.

*I. Waiver*

First, we address the State's contention that the Defendant has waived review of the issues presented because he failed to file a timely motion for new trial and did not provide adequate citations to the record in the argument section of his brief. "A motion for new trial shall be in writing, or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). The thirty-day period for filing a motion for new trial "is jurisdictional and cannot be expanded." State v. Hatcher, 310 S.W.3d 788, 800 (Tenn. 2010). As such, "[a] trial judge does not have jurisdiction to hear and determine the merits of a motion for new trial which has not been timely filed." State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004).

Failure to timely file a motion for new trial causes all issues to be "deemed waived except for sufficiency of [the] evidence and sentencing." Bough, 152 S.W.3d at 460. Likewise, a notice of appeal must be filed "within [thirty] days after the date of entry of the judgment appealed from." Tenn. R. App. P. 4(a). An untimely motion for new trial will not toll this thirty-day period. State v. Davis, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987). While this court may waive the untimely filing of a notice of appeal pursuant to Tennessee Rule of Appellate Procedure 4(a), we do not have the authority to

waive the untimely filing of a motion for new trial. State v. Stephens, 264 S.W.3d 719, 728 (Tenn. Crim. App. 2007).

The judgment in this case was entered on November 14, 2014. Thirty days from November 14, 2014 was a Sunday; therefore, the motion for new trial was due by Monday December 15, 2014. However, our review of the record shows that a motion for new trial was not filed until January 6, 2015, twenty-two days late.[10] A hearing on the motion for new trial was held on March 13, 2015, and was orally overruled on that same date. We emphasize that "[a] trial judge does not have jurisdiction to hear and determine the merits of a motion for new trial which has not been timely filed." Bough, 152 S.W.3d at 460. Accordingly, all issues except for the sufficiency of the convicting evidence have been waived.

We also note that, although not argued by the State, the late-filed motion for new trial did not toll the time for filing a notice of appeal, which was therefore due on December 15, 2014, but was not filed until April 10, 2015. Although the notice of appeal was filed within thirty days of the trial court's denying the motion for new trial, the time for filing the notice of appeal is not tolled by the filing of an untimely motion for new trial. However, unlike the motion for new trial, we have discretion to waive the timely filing of a notice of appeal, and we choose to do so in this case.

The State further argues that waiver of all issues, including sufficiency of the evidence, is appropriate due to the lack of citations to the record in the argument section of the Defendant's brief. The State is correct that the argument section of the Defendant's brief contains only two citations to the record. Both of those citations come during a discussion of the Defendant's seventh issue; the remaining issues contain no citations to the record whatsoever.[11] Tennessee Rule of Appellate Procedure 27(a) states that an appellant's brief "shall contain . . . [a]n argument . . . setting forth . . . the contentions of the appellant with respect to the issues presented . . . including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . ." (Emphasis added) The argument section of the Defendant's brief wholly fails to comply with this imperative. "Issues which are not supported by . . . appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). The appellate record in this case consists of over 1,800 pages. Although we strive to conduct a comprehensive review of the record in each case we review, it is not the duty of this court to scour the record in search of the

---

[10] Amended motions for new trial were filed on February 19, 2015, and March 13, 2015.

[11] Counsel was granted two extensions of time to file her brief and ultimately filed the brief five days late without a request to accept the late-filed brief.

facts supporting a defendant's argument. Consequently, the Defendant has waived review of all issues presented for review.

Waiver notwithstanding, "[w]hen necessary to do substantial justice," we may review an issue that has been waived for plain error. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). However, although the State raised the waiver issue in its brief, counsel for the Defendant chose not to file a reply brief in response. While there is nothing that could have been done to remedy the untimely motion for new trial, counsel could have at the very least requested that we conduct plain error review of the waived issues and, ideally, provided the pertinent analysis with references to the record. As it stands, counsel has made no request for plain error review.[12] Accordingly, we exercise our discretion and decline to conduct plain error review.

Despite our conclusions that the untimely motion for new trial and inadequate brief make all the Defendant's issues suitable for waiver, because of the severity of his conviction for first degree premeditated murder, we nevertheless choose to conduct a review of the sufficiency of the convicting evidence.

## II. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to convict him. Specifically, the Defendant argues that the only evidence connecting him to the victim's death was the uncorroborated testimony of Jason, an accomplice. The Defendant further argues that any corroborating evidence is undermined by inconsistencies among witnesses' testimony. The State responds that Jason's testimony was sufficiently corroborated and that the evidence was otherwise sufficient to support the Defendant's conviction.[13]

---

[12] We also feel compelled to note that the record contains a statement from counsel that she included some issues on appeal that she did not believe had merit. After the Defendant filed a complaint against counsel with the Board of Professional Responsibility ("BPR") taking issue with counsel's handling of his appeal, counsel sent a response to the BPR, ensuring that "every issue with a legal basis and even a couple of issues without a legal basis ha[d] been appealed in [the Defendant's] case." (Emphasis added). We remind counsel of her responsibility pursuant to Rule of Professional Responsibility 3.1 to "not bring or defend a proceeding, or assert or controvert an issue therein, unless after reasonable inquiry the lawyer has a basis in law and fact for doing so that is not frivolous . . . ."

[13] Before addressing the sufficiency of the evidence, the State analyzes whether Jason was an accomplice as a matter of law and, thus, whether the trial court erred in rejecting the Defendant's request to instruct the jury accordingly. The Defendant asserted error on this basis in his brief, but as previously discussed, he has waived review of that particular issue. Regardless, it is unnecessary to determine whether the trial court's jury instruction was proper because, where an accomplice's testimony is sufficiently corroborated, failure to properly instruct the jury on this issue is harmless error. See State v. Ballinger, 93 S.W.3d 881,

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657, S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy

---

888 (Tenn. Crim. App. 2001). Despite the fact that such a determination is not a necessary precursor to a sufficiency analysis, we feel compelled to note that this is a case where the jury clearly should have been instructed that Jason was an accomplice as a matter of law. He had been indicted for the same offense as the Defendant, making him a co-defendant in the case. Therefore, the trial court should have granted the requested jury instruction.

-13-

or ambiguous inference . . . ." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).  To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State."  State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

It is well-established in Tennessee that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice."  State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34,43 (Tenn. 1964)).  To qualify as an accomplice, it is not enough that the witness possess guilty knowledge, be morally delinquent, or even have participated in a separate but related offense.  See State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990).  The test is whether the alleged accomplice could be indicted for the same offense with which the defendant is charged.  State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); Pennington v. State, 478 S.W.2d 892, 897-98 (Tenn. Crim. App. 1971) (citations omitted).

Our supreme court has described what is required to establish sufficient corroboration as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity.  This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.  It is not necessary that the corroboration extend to every part of the accomplice's evidence.

Shaw, 27 S.W.3d at 903 (quoting Bigbee, 885 S.W.2d at 803).

First degree murder, in this instance, is defined as "[a] premeditated and intentional killing of another."  Tenn. Code Ann. § 39-13-202(a)(1).  A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result."  Tenn. Code Ann. § 39-11-302(a).

> "[P]remeditation" is an act done after the exercise of reflection and judgment.  "Premeditation" means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

-14-

Tenn. Code Ann. § 39-13-202(d).

In the light most favorable to the State, the evidence showed that the Defendant called Jason and expressed his anger at the victim for harming his mother. Specifically, the Defendant called Jason and said he was "fixing to kill this mother F'er because he just put his hands on [his] mom for the last damn time." Jason testified that the Defendant came to his apartment ten to fifteen minutes after this phone call, that the two men went to the victim's apartment, and that the Defendant shot the victim. Mr. Watkins testified that he saw two men running from the direction of the victim's apartment shortly after hearing the gunshots. He said that one of the men looked like "Jay" and that they were running in the direction of Jay's apartment. Ms. Davis testified that Jason left their apartment shortly before she heard gunshots. Ms. Davis further recalled that immediately following the gunshots Jason returned to the apartment, accompanied by the Defendant. Additionally, Ms. Davis testified that she saw the Defendant in the kitchen putting a yellow substance on his arms. Ms. Cordova said that she saw Jason and the Defendant together at Jason's apartment shortly after the victim's murder and described the Defendant as being "quiet" and "a little bit [fidgety]." Jason testified that the Defendant ordered him to "get rid of" the Defendant's clothes worn during the murder and to hide the murder weapon until a later time.

Although the Defendant points to discrepancies in the testimony of various witnesses, as we have oft repeated, questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence are resolved by the jury. See Bland, 958 S.W.2d 659. Similarly, corroboration of accomplice testimony need only be slight and need not extend to the entirety of the accomplice's testimony. See Shaw, 27 S.W.3d at 903 (citation omitted). Independent witnesses corroborated Jason's testimony that the Defendant was with him at his apartment immediately following the victim's murder. Mr. Watkins saw two men running from the victim's apartment in the direction of Jay's apartment. Ms. Davis corroborated Jason's testimony that the Defendant was "washing" himself with a yellow substance after the shooting. We conclude that the accomplice testimony was adequately corroborated and that the evidence supports the Defendant's conviction for the first degree premeditated murder of the victim. The Defendant is not entitled to relief.

CONCLUSION

Upon the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-15-